J-A15022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF THEODORE R. FLINT, DEBORAH D. FLINT AND POLYMERIC SYSTEMS, INC. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| LOUIS GIANSANTE, ESQ., AND GIANSANTE & COBB, LLC JOSEPH A. MCGINLEY, ESQUIRE AND JOSEPH A. MCGINLEY, ATTORNEY, LLC | : : : : : : | |
| APPEAL OF: JOSEPH A. MCGINLEY, ESQUIRE | : : | No. 3340 EDA 2018 |

Appeal from the Order Dated October 22, 2018
In the Court of Common Pleas of Chester County
Civil Division at No(s): 04-09152

BEFORE: BENDER, P.J.E., GANTMAN, P.J.E., and COLINS*, J.

MEMORANDUM BY GANTMAN, P.J.E.: **FILED AUGUST 02, 2019**

Appellant, Joseph A. McGinley, appeals from the order entered in the Chester County Court of Common Pleas, which granted the motion of Appellees, Estate of Theodore R. Flint, Deborah D. Flint, and Polymeric Systems, Inc., to enter judgment per the agreed-upon settlement and conclude all causes of action. For the following reasons, we affirm.

The relevant facts and procedural history of this case are as follows. On August 20, 1996, Mr. and Mrs. Flint retained Appellant and Louis Giansante to represent them in litigation concerning asbestos and other contaminants on their commercial property where they operated their business, Polymeric

_____
* Retired Senior Judge assigned to the Superior Court.

Systems, Inc. ("PSI"). At that time, both attorneys worked for Lavin, Coleman, Finarreli, & Gray ("Lavin"), but both attorneys later left and each established his own separate practice. Following their departure from Lavin, the attorneys agreed to continue representing the Flints under the same 1996 fee agreement. The fee agreement provided for a one-third contingent fee for any monetary reward, and a $135.00 hourly fee for time spent seeking non-monetary relief. Specifically, the agreement stated:

> 3. Clients agree to pay for Attorneys' services in connection with this claim by payment of [one-third] of the net recovery whether recovery is made by settlement, verdict or judgment.
>
> \* \* \*
>
> 6. If it becomes necessary to enter into negotiations with Insurance Companies or other entities to seek non-monetary relief, such as indemnification, on the clients' behalf our charges for services will be at the hourly Attorney rate of $135.

(*See* Contingent Fee Agreement, dated 8/20/96, at 1; R.R. at R-84.)

The Flints' case soon disintegrated after they lost several pre-trial motions. As a result, on June 24, 2004, the Flints settled for a cash amount of $40,800.00, which was much lower than the multi-million dollars they had originally sought. The settlement also provided that the defendants in the contamination litigation would bear two-thirds of the cost of completing an environmental assessment of the property. Following settlement, Appellant and Attorney Giansante demanded one-third of the $40,800.00 (or $13,600.00), plus they claimed they were additionally owed $135.00/hour for

every hour spent working on the case from 2001 to 2004. The Flints refused to pay, so Attorney Giansante sued the Flints in New Jersey; and Appellant threatened to file a similar lawsuit against the Flints in Pennsylvania.

On November 8, 2004, Appellees (the Flints and PSI) filed a complaint for (1) declaratory judgment regarding the amount of fees owed and (2) attorney's fees and costs in defending against the demand for additional legal fees. The court entered an order on August 4, 2006, in which the court determined the fee agreement was clear on its face and the attorneys were not entitled to payment of $135.00/hour for all hours spent on the case. The court also decided the matter could proceed to trial on the question of how many hours the attorneys had spent negotiating for non-monetary relief (for which they would be entitled to $135.00/hour) and whether the attorneys owed the Flints reimbursement for attorney's fees and the costs of litigating the declaratory judgment action. Appellant and Attorney Giansante filed separate appeals, which this Court consolidated.

On November 15, 2007, this Court quashed the appeals as interlocutory and remanded for further proceedings, stating the August 4, 2006 order was not a final order because it failed to resolve all outstanding claims; our Supreme Court denied allowance of appeal on December 24, 2008. *See Flint v. Giansante*, 944 A.2d 807 (Pa.Super. 2007), *appeal denied*, 599 Pa. 710, 962 A.2d 1197 (2008). The case remained dormant for several years due to administrative orders and other delays. On August 22, 2013, Appellant and

Attorney Giansante filed a joint motion to reconsider the August 4, 2006 order. The court denied the motion on January 15, 2016.

On November 14, 2017, the date scheduled for trial, the parties agreed on the record to a "stipulated verdict" of $6,750.00 (representing $135.00/hour for 50 hours) to be paid by the Flints to Appellant and Attorney Giansante. At the time of the agreement, Appellant stated:

> This is [Appellant] and we have agreed to stipulate to a number of hours, given the restriction of testimony that was discussed for the hour[s] that [the court] referred to.
>
> We believe that the testimony that was going to be permitted was restricted to some time for federal mediation, some time for the last day of—or the first day of trial, the underlying case, and limited preparation time for the federal mediation.
>
> It is upon the restricted testimony that we have stipulated to this amount.

(**See** Hearing, dated 11/14/17, at 3-4; R.R. at R-129-30.) All of the parties agreed to prepare and file the stipulated judgment memorializing the verdict, but Appellant subsequently refused to sign the proposed stipulated judgment. As a result, Appellees filed a motion on September 21, 2018, to enter "judgment per the agreed-upon settlement" and to mark the case settled, discontinued, and ended. Attorney Giansante agreed with Appellees' motion. Appellant did not respond or oppose the motion. On October 22, 2018, the court granted Appellees' motion as unopposed, entered judgment on the stipulated verdict, and marked the case as follows:

AND NOW, this 22nd day of October 2018, upon of the

> [Appellees'] Motion for Entry of Judgment per Agreed-Upon Settlement, and no opposition thereto being filed, it is hereby ORDERED that the motion is GRANTED.
>
> It is FURTHER ORDERED that judgment is entered in the amount of $6,750.00 to be paid (solely to the extent not already paid), by [Appellees] to [Appellant and Attorney Giansante], and that this judgment, in conjunction with the partial declarations made previously by this [c]ourt, finally declares the rights of the parties in this action and brings to a conclusion all causes of action.

(*See* Trial Court Order, filed October 22, 2018; R.R. at R-1) (*See also* docket entries).

Appellant filed a notice of appeal on November 13, 2018. On November 20, 2018, the court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b), and Appellant complied on December 12, 2018. On January 28, 2019, Appellees filed in this Court an application to dismiss or quash Appellant's appeal, claiming Appellant had acquiesced in the "settlement" and did not oppose the motion to enforce it, so he is no longer an aggrieved party. Appellant responded on February 19, 2019, claiming he only agreed to the "settlement" because a trial would not have been "valuable" and an "agreed or stipulated verdict" would permit this Court to review the court's interpretation of the parties' fee agreement. On February 26, 2019, this Court denied Appellees' motion without prejudice to raise the issue in their appellate brief.

Appellant raises the following issues on appeal:

> WHETHER THE TRIAL COURT'S INTERPRETATION OF THE FEE AGREEMENT MUST BE CONSISTENT WITH THE

EXPRESSED UNDERSTANDINGS OF COUNSEL AND CLIENT, AND INCORPORATE THE PURSUIT OF ALTERNATE THEORIES SEEKING MONEY DAMAGES AND NON-MONETARY RELIEF?

WHETHER THE COMPLAINT IN THE UNDERLYING ACTION, WHOSE TERMS WERE VERIFIED BY THE FLINTS AND POLYMERIC SYSTEMS, WHICH TERMS CONSTITUTE JUDICIAL ADMISSIONS, DEMONSTRATES THAT "NON-MONETARY RELIEF" UNDER PARAGRAPH 6 OF THE FEE AGREEMENT WAS SOUGHT AFTER AND WORKED FOR FROM THE BEGINNING OF THE CASE?

WHETHER THE TRIAL COURT WAS ENTITLED TO MAKE A FACTUAL DETERMINATION THAT ALL ASPECTS OF THE UNDERLYING LITIGATION WERE CONCLUDED PRIOR TO COUNSEL'S TERMINATION WHERE THE RECORD REFLECTS AN ORDER, AND ACTIVITY IN ACCORDANCE WITH THAT ORDER, REQUIRING ALL PARTIES TO CONTINUE GROUNDWATER TESTING AND FURTHER MOVEMENT TOWARD REMEDIATION?

WHETHER PENNSYLVANIA LAW REQUIRES THE FEE RESOLUTION FOR TERMINATED COUNSEL BE BY *QUANTUM MERUIT*? ...

WHETHER THE TRIAL COURT ERRED IN BARRING ALL EVIDENCE OF HOURS WORKED AND THE REASONABLENESS OF THOSE HOURS FROM JURY PRESENTATION AND WHETHER THE TRIAL COURT ERRED IN LIMITING EVIDENCE OF HOURS WORKED TO TWO DAYS OF FEDERAL COURT MEDIATION AND SOME PREPARATION THEREFORE?

WHETHER THE TRIAL COURT ERRED IN DETERMINING IN 2006 THAT THE FEE AGREEMENT WAS A CONTINGENT FEE AGREEMENT ONLY, WITH RARE EXCEPTION FOR DIRECT NEGOTIATIONS WITH INSURERS, WHERE THE FINDING IS UNDERCUT BY THE COMPLAINT THAT WAS VERIFIED BY THE FLINTS AND POLYMERIC SYSTEMS?

WHETHER THE EXPECTATIONS OF THE FLINTS AND COUNSEL AT THE TIME OF THE UNDERLYING SETTLEMENT WAS TO MOVE FORWARD WITH CHARACTERIZATION OF

THE SOIL; CONTINUED PURSUIT OF POLLUTERS; AND
ULTIMATELY TO ACHIEVE FULL REMEDIATION OF THE SOIL
TO ACT II PERMITTED LEVELS OF CONTAMINATION?

(Appellant's Brief at 2-4).

As a prefatory matter, Appellees have renewed their application to quash or dismiss the Appellant's appeal. Specifically, Appellees argue Appellant cannot appeal the entry of the final judgment in this case because he acquiesced to the stipulated verdict and failed to oppose the motion to enforce it. Given the parties' knowing and voluntary settlement of their dispute before the trial court, Appellees contend an actual case or controversy no longer exists. Appellees allege Appellant is not an "aggrieved" party for purposes of appeal. Appellees further maintain Appellant did not include any challenge to the parties' voluntary resolution in his Rule 1925(b) statement. Appellees conclude Appellant failed to identify any issues for appeal to undo the settlement or judgment.

Appellant responds he agreed to the stipulated verdict as an "administrative gesture" so he could appeal the court's August 4, 2006 order, which determined Appellant and Attorney Giansante were not entitled to an hourly fee for all hours worked in the case. Appellant contends the record shows he only acquiesced to the stipulated verdict because the court decided to limit testimony, concerning the number of hours Appellant and Attorney Giansante worked on Appellees' case, to the hours they had spent on the first day of trial and in preparation for federal mediation. Appellant maintains he

did not intend to enter into a "global settlement" with Appellees. Rather, Appellant argues the only settlement that resulted from the agreed-upon verdict was with Attorney Giansante alone, and Appellant was not a party to that settlement. Appellant concludes his concise statement adequately preserved the issues he now raises on appeal.

Pennsylvania Rule of Appellate Procedure 501 provides:

**Rule 501. Any Aggrieved Party May Appeal**

Except where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom.

> *Note:* Whether or not a party is aggrieved by the action below is a substantive question determined by the effect of the action on the party, etc.

Pa.R.A.P. 501. "A party is 'aggrieved' when the party has been adversely affected by the decision from which the appeal is taken." ***Ratti v. Wheeling Pittsburgh Steel Corp.***, 758 A.2d 695, 700 (Pa.Super. 2000), *appeal denied*, 567 Pa. 715, 785 A.2d 90 (2001). Our Supreme Court has set forth the following guidelines to meet this requirement:

[I]n Pennsylvania, a party must be aggrieved in order to possess standing to pursue litigation. Aggrievability is obtained by having a substantial, direct, and immediate interest in proceedings or litigation. When the standards for substantiality, directness, and immediacy are readily met, the inquiry into aggrievability, and therefore standing, ends.

***Johnson v. American Standard***, 607 Pa. 492, 516, 8 A.3d 318, 333 (2010).

"Ordinarily, a party who consents to, or acquiesces in, a judgment or

order cannot appeal therefrom." ***Brown v. Com., Dept. of Health***, 495 Pa. 456, 460, 434 A.2d 1179, 182 (1981). Where an order is entered pursuant to a stipulated agreement, however, appellate review is permitted if the order explicitly allows for an appeal or the record reveals the parties anticipated an appeal. ***Laird v. Clearfield & Mahoning Ry. Co.***, 591 Pa. 322, 916 A.2d 1091 (2007) (holding appellate review of pre-trial rulings following entry of stipulated order was not precluded where record revealed appellants expressed desire to preserve their appeal rights, during course of stipulation discussions). The conduct of the parties and the court, and the language of the order are used to determine whether the stipulated agreement envisioned further review. ***Id.*** ***See also Keystone Bldg. Corp. v. Lincoln Sav. And Loan Ass'n***, 468 Pa. 85, 360 A.2d 191 (1976) (determining conduct of parties and language of consent decree showed parties had agreed to resolve only one issue in case and did not intend consent decree to be final determination of entire claim; parties preserved their right to litigate other issues).

Additionally, "[i]ssues not raised in the [trial] court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "[I]ssues are preserved when objections are made timely to the error or offense." ***Commonwealth v. Baumhammers***, 599 Pa. 1, 23, 960 A.2d 59, 73 (2008), *cert. denied*, 558 U.S. 821, 130 S.Ct. 104, 175 L.Ed.2d 31 (2009). "[A] party may not remain silent and afterwards complain of matters which, if erroneous, the court would have corrected." ***Commonwealth v. Strunk***, 953 A.2d 577,

579 (Pa.Super. 2008) (quoting **Commonwealth v. Clair**, 458 Pa. 418, 423, 326 A.2d 272, 274 (1974)). **See e.g. Commonwealth v. Burns**, 765 A.2d 1144 (Pa.Super. 2000), *appeal denied*, 566 Pa. 657, 782 A.2d 542 (2001) (holding appellant waived his argument regarding trial court's decision to strike prospective juror because appellant failed to object on record).

Furthermore, Rule 1925(b) requires that statements "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(ii). "[I]ssues not included in the Statement and/or not raised in accordance with the provisions of [Rule 1925(b)(4)] are waived." Pa.R.A.P. 1925(b)(4)(vii); **Majorsky v. Douglas**, 58 A.3d 1250 (Pa.Super. 2012), *appeal denied*, 620 Pa. 732, 70 A.3d 811 (2013), *cert. denied*, 571 U.S. 1127, 134 S.Ct. 910, 187 L.Ed.2d 780 (2014).

Instantly, on November 14, 2017, the parties agreed on the record to a stipulated verdict of $6,750.00, to be paid by Appellees to Appellant and Attorney Giansante. All of the parties agreed to the preparation and filing of the stipulated judgment memorializing the verdict. Appellant, however, subsequently refused to sign the proposed stipulated judgment. As a result, Appellees filed a motion on September 21, 2018, to enter "judgment per the agreed-upon settlement" and to mark the case settled, discontinued, and ended. Attorney Giansante filed a memorandum in support of Appellees' motion, whereas Appellant did not respond or oppose the motion. On October

22, 2018, the court granted Appellees' motion as unopposed, entered judgment on the stipulated verdict, declared the respective rights of the parties to the action, and brought to a conclusion all causes of action. Notwithstanding that final judgment, on November 13, 2018, Appellant filed this appeal.

Initially, Appellant agreed on the record to the stipulated verdict. But when Appellees sought to reduce the stipulated verdict to judgment, Appellant refused to sign the stipulation. After Appellees filed a motion to enforce the stipulated or agreed-upon verdict, Appellant failed to object or oppose it. Neither the record nor the language of the order expressed Appellant's intent to appeal. To the contrary, the conduct of the parties and the court as well as the language of the court's order make clear the stipulated verdict and judgment contemplated **no** further review. Thus, Appellant's position fails the *Laird* rule and, under Pennsylvania law, he arguably is not an aggrieved party with standing to appeal that judgment. **See** Pa.R.A.P. 501; **Laird, supra**; **Brown, supra**.

Additionally, Appellant arguably waived his right to appeal from the stipulated verdict/judgment because Appellant failed to put on the record any reservations about the verdict or his intent to appeal the judgment entered on the agreed-upon verdict. **See** Pa.R.A.P. 302(a); **Strunk, supra**. Appellant had the opportunity to object explicitly to the creation, content, and entry of the stipulated verdict; but he failed to do so. Appellant directs our attention

- 11 -

to his statement on the record (**see** N.T. Hearing, 11/14/17, at 3-4; R.R. at R. 129-30), but that statement is insufficient to show his agreement was qualified, his intent was to challenge the court's prior order of August 4, 2006, in an appeal, or his wish to preserve his appellate rights in any other respect. Thus, Appellant cannot now justifiably assert that he had agreed to the stipulated verdict as an "administrative gesture," solely for the purposes of a later appeal. **See id.**

Furthermore, Appellant failed to raise any challenge in his Rule 1925(b) statement to the parties' voluntary resolution of the case or to the court's October 22, 2018 order entering judgment per the agreed-upon verdict and concluding all causes of action. Instead, Appellant confines his dispute to the court's interpretation of the fee agreement.[1] Appellant has therefore possibly

---

[1] In Appellant's issues combined, he challenges the court's interpretation of the parties' 1996 fee agreement. According to Appellant, the fee agreement provided for Appellant and Attorney Giansante to recover **both** the one-third contingent fee based on the $40,800.00 monetary reward **plus** an hourly fee of $135.00/hour for every hour spent on the case between 2001 and 2004. Appellant maintains the attorneys were entitled to the hourly fees because their legal work done in preparation for trial, between 2001 and 2004, laid the foundation for Appellees to negotiate the non-monetary aspects of the settlement including sharing the costs of remediation. Appellant contends the trial court misinterpreted the fee agreement to allow only the one-third contingent fee of the $40,800.00 monetary reward, and a $135.00 hourly fee based on a limited number of hours spent working on mediation and the first day of trial. In doing so, Appellant avers the court failed to consider specific language contained in the verified complaint, as well as testimony regarding mediation discussions between Appellant and Mr. Flint, that showed the attorneys and Appellees sought both monetary and non-monetary relief from the beginning of the case. Alternatively, Appellant claims he has the right to *quantum meruit*.

- 12 -

waived any challenge related to the parties' stipulated verdict and the judgment entered on it. **See** Pa.R.A.P. 1925(b)(4)(vii); ***Majorsky, supra***.

Finally, assuming without deciding Appellant qualifies as an aggrieved party **and** properly preserved his issues per Rules 302 and 1925(b), we would affirm based on the trial court opinions. (**See** Trial Court Opinion, filed August 7, 2006, at 17-29) (finding: 1996 fee agreement made clear Appellees owed Appellant and Attorney Giansante one-third of net recovery from damages action; if Appellant and Attorney Giansante failed to obtain monetary recovery, Appellees would not owe them any fees for services rendered in attempting to recover damages associated with property's contamination and its remediation, or for any other recovery sought in damages action; fee agreement plainly restricts hourly fees to time spent securing non-monetary relief; sole non-monetary relief obtained in this case was recovery from asbestos-litigation defendants some limited contributions to costs incurred going forward in completing environmental assessment; hourly legal fees attributable to other services provided by Appellant and Attorney Giansante are not compensable under paragraph 6 of fee agreement; Appellees paid their attorneys required contingent fee based upon settlement recovery of $40,800 as mandated by fee agreement; Appellant and Attorney Giansante are entitled to be paid for their legal services in securing asbestos-litigation defendants' indemnity payments in accordance with paragraph 6 of fee agreement). (**See also** Supplemental Trial Court Opinion, filed January 10,

2019, at 2-5) (finding: on 11/14/17, parties agreed to settlement in form of stipulated judgment for $6,750.00, to be paid by Appellees to Appellant and Attorney Giansante; settlement was placed on record before court, and parties agreed to prepare and file stipulated judgment memorializing agreed-upon settlement; court subsequently entered judgment in sum of $6,750.00, based on settlement agreement of parties and ordered discontinuance of action as to all parties; notably, Appellant's Rule 1925(b) statement does not challenge trial court's entry of latter order).  Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/2/19

THEODORE R. FLINT,
DEBORAH D. FLINT, and
POLYMERIC SYSTEMS, INC.
    Plaintiffs

        v.

LOUIS GIANSANTE, ESQUIRE
et. al.
    Defendants

IN THE COURT OF COMMON PLEAS
CHESTER COUNTY, PENNSYLVANIA

**SENT**

**AUG 09 2006**

NO. 04-09152

CIVIL ACTION – LAW

Andrew P. Foster, Esquire, Megan Cherner-Ranft, Esquire, Attorneys for Plaintiffs.
Louis Giansante, Esquire, Attorney for Defendants Louis Giansante, Esquire and
    Giansante & Cobb, LLC.
John Brian Frock, Esquire, Attorney for Defendants Joseph A. McGinley, Esq.
    and Joseph A. McGinley Attorney LLC

## OPINION and ORDER

Before me for decision is Defendant, Joseph A. McGinley Esquire's

"Motion for Declaratory Judgment and for Oversight" in which he seeks

an order pursuant to the Declaratory Judgments Act, 42 Pa. C.S.A.

§7531 et seq construing a Contingent Fee Agreement dated August 20,

1996 (the "Fee Agreement") and his rights thereunder.  The Act provides

that a court may construe the terms of a written contract and declare

disputed rights of the parties in a declaratory judgment action, and a

contract may be construed either before or after a breach has occurred.

42 Pa. C.S.A. §§7531 & 7534.  Some explanation of the events leading

to the inception of this litigation is necessary to an understanding of the

divergent positions advanced by the parties, fueled by their differing

# APPENDIX "A"

historical perspectives which, in turn, have generated a barrage of facts and counter-facts, prolix arguments and counter-arguments, and multiple and shifting legal theories that tend to cloud the Fee Agreement under scrutiny.

Factual Background:

Both McGinley and fellow attorney, Louis Giansante, Esquire were with the Philadelphia law firm of Lavin, Coleman, Finarelli and Gray ("Lavin Firm"), with whom the Flints, on behalf of themselves and their corporation, Polymeric Systems, Inc., (collectively, the "Flints") contracted under the terms of the Fee Agreement to represent them in a lawsuit they brought in Chester County against various defendants, among whom were A.P. DeSanno Company and its affiliates, Textron, Inc., and Radiac Abrasives, Inc. ("DeSanno Defendants"), prior owners of the Flints' Phoenixville, Chester County real estate, which those defendants had previously used for the manufacture of grinding wheels (the "Phoenixville Property"). Specialty Chemicals, a former leasee, was also sued. The lawsuit was premised upon contamination of the Property by asbestos and by prior owners industrial operations occurring there. It appears that the Flints purchased the Property without the benefit of a pre-settlement environmental assessment. Giansante and

2

McGinley separately left the Lavin Firm subsequent to that Firm undertaking the Flints' representation, but were later contacted by the Flints and requested to take over their representation, since Giansante had expertise in environmental litigation. Both attorneys agreed to represent the Flints under the terms of the Fee Agreement, and both were actively engaged in their representation during the DeSanno lawsuit.

Several years following their purchase of the Phoenixville Property in 1983, the Flints commissioned environmental assessments of the Property, including Phase I and Phase II environmental studies, which revealed the presence of metal contaminants, including lead in various locations on the Property, and the presence of asbestos insulating materials in one or more of the buildings, all requiring remediation of certain buildings, soil and ground water. During the Flints' ownership, a third defendant, Specialty Chemicals, Inc., leased a portion of the Phoenixville Property for the purpose of manufacturing lead-based and tin-based acids. Finding that site assessments and anticipated remediation costs approached Three Million Dollars, the Flints instituted suit against the DeSanno Defendants, seeking the recovery of past and anticipated environmental remediation costs, substantially predicated on

3

the Pennsylvania's Hazardous Sites Cleanup Act, 35 P.S. §§6020.101 et seq, public nuisance, negligence, breach of contract and fraudulent misrepresentation. They also sought damages for diminution of the Property's value.

In their lawsuit against the DeSanno Defendants and Specialty Chemicals, the Flints essentially sought some $3,000,000 in remediation costs, and their lawyers, Giansante and McGinley, each devoted literally hundreds of hours to preparing the case for trial, anticipating that their work would eventually be rewarded with a substantial recovery, from which their contingent fee of thirty-three and one third percent (33-1/3 %) provided for in the Fee Agreement would be paid. However, during the week before trial was to begin, the trial judge eviscerated the Flints' case following a plethora of pre-trial motions filed by the DeSanno Defendants, including, significantly, partial summary judgment in those defendants' favor with respect to various counts of the Flints' complaint, and, significantly, the judge's determination that the Flints' private right of action seeking recovery of remediation costs under the Pennsylvania's Hazardous Sites Cleanup Act limited the Flints' recovery to incurred or past remediation costs only. Stripped of various claims and left with no ability to recover the future costs of remediation at trial, the Flints settled

4

the case for a cash payment of $20,400 from Textron and $20,400 from Radiac and M&R Industries. Approved by the DeSanno trial court's June 24, 2004 Order, the settlement agreement also included Textron" and Radiac's agreement to each pay one-third of "the costs to be incurred from this date forward for the completion of the environmental assessment of the subject property by the selected qualified expert". The Flints agreed to pay the remaining one-third of those costs. Attribution of responsibility for the actual remediation costs identified by the environmental assessment was not resolved in the court-ordered settlement. In this respect the Agreement stated that the parties had "not agreed to any sharing or allocation of costs for any remediation or proposed remediation or for any other 'response costs' under".... the Hazardous Sites Cleanup Act. ("DeSanno Settlement Agreement"). Subsequently, Textron and Radiac each paid $20,000 towards the costs of the environmental assessment, as agreed.

The Settlement Agreement approved by the trial court explicitly stated that in exchange for the recited consideration of $40,800 the Flints agreed "to release and dismiss with prejudice all claims they have against Textron, Radiac and Specialty Chemical Systems, Inc. "... for all claims or costs incurred for asbestos abatement and for the investigation

5

and remediation of hazardous substances on Plaintiff's real property...." and, further "to dismiss with prejudice the instant action" and a concurrent federal action filed by the Flints against defendants.

After the DeSanno litigation was settled, and following some negotiations during which McGinley and Giansante sought to be paid on an hourly basis for their legal services in the DeSanno litigation, discussions broke down. The attorneys believed that they were due hourly fees for their work on the case in addition to the one-third contingent fee they were paid following the court's approval of the Settlement Agreement. Those discussions were terminated without resolution of the fee dispute. Giansante maintains that he remained ready, willing and able to continue his representation of the Flints on an hourly basis, but insisted upon the Flints signing a new fee agreement and a conflict of interest waiver in light of possible litigation over the meaning of the Fee Agreement. He now argues that the Flints refusal to sign the waiver, which he sent to the Flints on July 6, 2004, constituted his de facto discharge as the Flints' attorney.

Subsequently, attorney Michael Olley was consulted by the Flints concerning the fee dispute. (Deposition Exhibit P-28). Olley opined that Giansante and McGinley were not entitled to additional fees under the

6

Fee Agreement, and advised Giansante that the Flints declined to pay his "compromise" fee of $100,000. Giansante thereafter submitted a detailed statement to the Flints for $200,503.42 calculated on an hourly basis for his services rendered in the DeSanno litigation. Giansante also claims that he was discharged as the Flints attorney by Olley, with their permission. McGinley, who had been willing to compromise his separate fees, also submitted his statement for legal services calculated on an hourly basis from the inception of the DeSanno litigation for the amounts stated in his counterclaim.

The Flints captioned lawsuit was instituted by them and their corporation, Polymeric, in a two-count complaint seeking a declaratory judgment pursuant to 42 Pa. C.S.A. §7531 to determine their liability for legal fees that are due and owing, if any, under the terms of the Fee Agreement arising out of the DeSanno litigation, and, in addition, compensatory damages, including attorneys' fees and related legal costs they have incurred in defending Giansante's and McGinley's claims for additional legal fees. Giansante and his law firm, Giansante and Cobb, LLC has sued the Flints in New Jersey seeking compensatory, civil RICO damages, punitive damages, legal fees and courts costs arising out of the latter's representation of the Flints in connection with the DeSanno

7

litigation. Giansante filed an answer and new matter to the Flints captioned lawsuit, but not a counterclaim given his New Jersey lawsuit. McGinley has filed a counterclaim in the captioned action seeking the payment of hourly legal fees he contends to be due him under the terms of the Fee Agreement.

In the instant litigation before me, Giansante and McGinley advance the contentions that the significance of the court's pre-trial decisions that forced the DeSanno Settlement Agreement was to postpone the determination of both the award of future costs associated with remediation of the Flints' Phoenixville Property and the determination of the diminution in its value arising as a result of its contamination. And, they argue, it was their legal work in preparation for the DeSanno defendants' lawsuit and trial that provided the framework upon which the Flints could later negotiate with the DeSanno defendants for a sharing of the costs of remediation and diminution in their Phoenixville Property's value. Through their legal efforts from the inception of their representation in readying the DeSanno case for trial and securing its settlement, Giansante and McGinley argue that their efforts have provided the Flints with leverage in their future negotiations with Textron, Radiac and others for future remediation contributions,

8

even though the DeSanno court's Order approving the Settlement Agreement ended the DeSanno defendants' liability for such contributions. They thus contend that under the Settlement Agreement's terms, they are entitled to be paid the hourly fees they have billed to the Flints in addition to the contingent fee attributable to the recovery of damages due under the terms of the Fee Agreement. They thus contend that their engagement as the Flints' attorneys and their entitlement to legal fees under the Fee Agreement were not terminated by the Textron Settlement Agreement because their representation was understood by the parties to encompass any future recovery the Flints are able to negotiate with the DeSanno defendants, which they argue would be attributable to their legal work preceding the Settlement Agreement. These alleged entitlements are what I shall refer to as "Ascribed Legal Benefits". In advancing these contentions, they view their essential task under the Fee Agreement as the protection of the Flints from future remediation costs and recovery of the diminished value of the Phoenixville Property, neither of which is now recoverable from the DeSanno defendants.

Admittedly, they have not been paid a fee for the $40,000 paid by Textron and Radiac toward the further cost of the environmental

9

assessment of the Flints' Property required by the Settlement Agreement. Giansante also claims the Flints owe $1,036.75 in unreimbursed court costs under the Fee Agreement.

McGinley's Declaratory Judgment Motion:

McGinley's instant Motion is confusing. While it is stated as his Motion, both the proposed order that accompanies it, as well as the praecipe for determination state that it is also filed on behalf of Giansante. In view of the Order I am entering in conjunction with this Opinion, I will treat the Motion as a joint one. It should be noted that by Order dated June 30, 2006 I denied Giansante's Motion seeking summary judgment in the Flint's captioned lawsuit.

McGinley has asserted a three-count counterclaim against the Flints. He seeks $105,367.50 for his services at the hourly rate of $135.00 specified in the Fee Agreement as applicable to "non-monetary relief", $136,587.50 premised on a quantum meruit claim at an hourly rate of $175.00, and $50,000.00 he claims attributable to the Flints' bad faith in not paying his fees.

The first leg of McGinley's Motion asserts that the focus of the Textron and Radiac litigation was to insulate the Flints and their corporation from remediation costs of some $3,000,000, not simply to

10

recover money to pay those costs. He asserts that the DeSanno Settlement Agreement was the culmination of substantial legal efforts on his part, the value of which is properly measured by the number of hours he spent in preparing the litigation to achieve the settlement and the Ascribed Legal Benefits, the so-called "conferred benefits" as he puts it, for which he is entitled to recovery in the alternative, for reimbursement at the rate of $135.00 per hour, stated in the Fee Agreement as attributable to "non-monetary relief", or $175.00 per hour on a quantum meruit basis. The second leg of McGinley's Motion seeks a court-ordered "protection" of McGinley's and Giansante's entitlement to future legal fees by requiring the Flints to provide *Giansante* with all investigative environmental assessment and remediation data collected by or on behalf of the Flints with respect to their Phoenixville Property to insure that they do not short-cut the assessment and remediation process, which obviously would have the effect of reducing their legal fees under their "conferred benefits" entitlement theory. McGinley points to deposition testimony of Plaintiff, Theodore Flint, suggesting to McGinley that the on-going remedial assessment of the Flints' property, now under the Flints' control, has been curtailed and is not being vigorously pursued, which he contends is fraudulent as to him and

11

Giansante, as well as the Pennsylvania Department of Environmental Protection, an entity not involved in the captioned litigation.

The Flints vigorously oppose McGinley's declaratory judgment motion and have filed their own counter- motion for declaratory judgment, which their Complaint also seeks, based upon their interpretation of the Contingent Fee Agreement. The Flints' counter motion contends that their liability for the Ascribed Legal Benefits asserted by McGinley and Giansante is fixed by the contingency provision of the Fee Agreement, that their damages claim was resolved by the DeSanno Settlement Agreement, which in turn fixed their liability for legal fees arising from the DeSanno litigation, that they paid McGinley and Giansante the agreed-upon contingent fee calculated on the $40,880 settlement recovery established in the Fee Agreement, (which is not denied), and that the Settlement Agreement ended the DeSanno litigation and McGinley's and Giansante's engagement as their attorneys. They believe that any remaining liability they may have to McGinley and Giansante is limited by the "non-monetary relief" provision of the Fee Agreement for the time spent by them in negotiating Textron's and Radiac's contributions toward the cost of the environmental assessment of the Flints' Property, provided for in the Settlement Agreement.

12

The Contingent Fee Agreement:

The Contingent Fee Agreement provides in pertinent part, as follows:

"1.     Clients hereby appoint, retain and authorize Attorneys to bring suit or to settle and compromise before or after suit all claims on behalf of the Clients arising out of damages sustained by the clients as a result of purchasing a property located at 723 Wheatland Street, Phoenixville, PA on which are located buildings with asbestos-containing materials.

2.     Clients agree not to settle or adjust this claim or any proceedings based thereon without written consent of Attorneys, nor to terminate the employment of Attorneys without consent of Attorneys and payment for services rendered.

3.     Clients agree to pay for Attorneys' services in connection with this claim by payment of 331/3% of the net recovery whether recovery is made by settlement, verdict or judgment.

4.     Attorneys agree to use their best efforts to settle or prosecute this claim. If no recovery is obtained, Attorneys shall have no claim for attorneys' fees against Clients for services rendered.

5.     Attorneys are authorized to pay from Clients' share of any recovery all expenses, repair bills, subrogation claims, witness fees, expert witness fees, costs of consulting experts, court costs and any other out-of-pocket expenses which constitute any part of Clients' claim or which are necessary to the recovery of the claim.

6.     If it becomes necessary to enter into negotiations with Insurance Companies or other entities to seek non-monetary relief, such as indemnification, on the clients' behalf our charges for services will be at the hourly Attorney rate of $135."

The Fee Agreement was preceded by discussion among the Flints

and their attorneys concerning the basis upon which the latter would

undertake the Flints' representation, the history of which is instructive to a determination of the instant Motions. Giansante had been provided with information about contamination of the Flints' Phoenixville Property by an environmental consulting firm, which did not at that time disclose the entire scope of the environmental contamination, as it predated the Phase I and II studies. Giansante then prepared an interoffice memorandum for the Lavin Firm, of which he was then a member, suggesting that the case be taken on a contingent fee basis, with a flat monthly fee added, for which credit would be given to the clients upon recovery and payment of the contingent fee. Exhibits P- 3 thru P-7. Members of the Lavin Firm, including Giansante, conducted a meeting on July 30, 1996 with the environmental consultant, memorialized in writing, to discuss the particulars of the remediation to the extent it was then understood, legal requirements respecting removal of the asbestos contamination, potential future claims resulting from employees' exposure to asbestos, evaluation of insurance issues and potential liability of unidentified insurance companies in sharing liability for the remediation, liability of prior owners of the Property and, importantly, structuring the Lavin Firm's legal fees. Shortly after this meeting, Clinton, on behalf of the Lavin Firm, prepared and sent the Fee

14

Agreement to the Flints, which they promptly signed, engaging the Firm to handle the contamination lawsuit. Exhibit P-8 & P-9.

The July 30, 1996 meeting memorandum contains the following description of the proposed fee structure:

"Henry (Clinton, a principal of the Lavin Firm) explained that it is not unusual for a law firm to charge 40% of the total recovery; the client is typically responsible for costs. However, in this instance, they are proposing a 33 1/3 contingency fee arrangement, i.e., if any recovery is made, they would get 1/3."

"If carriers would need to be pursued, Lou (Giansante) thought that could be fit in under the contingency. Lou's time for negotiations would be at the rate of $135/hour". Exhibit P-8 & P-9.

In his executed verification dated February 24, 2006, Henry Clinton, states that on August 1, 1996, he forwarded the Fee Agreement to Plaintiff, Theodore Flint by FAX, together with a cover letter in which he explained the non-monetary relief provision governing indemnification, also described in his verification, as follows:

"Paragraph 6 of the contingency agreement addresses non-monetary relief. As we discussed, if we negotiate with insurance carriers to obtain indemnification from them in the event of any future litigation,

15

by for instance, former or current employees as a result of any alleged exposure to asbestos, those negotiations with your carriers will be performed at an hourly Attorney rate of $135."

"As stated in this quoted paragraph, the attorney rate of $135 applied only to time spent negotiating on behalf of the clients to seek non-monetary relief, such as indemnification from insurance carriers or other entities." Exhibit P-10 & P-11.

Giansante maintains that in discussing with Clinton what should be included in the Fee Agreement, he explained to Clinton that "environmental plaintiff's agreements have to be drafted to protect the firm if relief is accepted by a client that is not readily reducible to a monetary amount". In such cases, "it is appropriate to negotiate a fixed hourly rate that would attach for all work done so that the client would be billed on an hourly basis related to the relief that they have taken". Exhibit P-14, pp. 46-47. Indeed, Giansante's Answer to the Flints' Complaint avers that "the parties to the agreement [the Fee Agreement] included a provision that allowed for the payment of all time applied to the case by the attorneys at a reduced hourly rate" that induced the Lavin Firm to undertake the Flints' case. However, that is not precisely the case, as Paragraph 6 of the Fee Agreement prepared by Clinton did

16

not embody the language specified in Giansante's Answer. It does not include "a provision that allowed for the payment of all time applied to the case by the attorneys at a reduced hourly rate". Rather, the Fee Agreement sent by Clinton to the Flints addressed the hourly rate only in relation to negotiations with insurance companies or other entities to seek "non-monetary relief, such as indemnification", as reinforced in his transmittal letter to the Flints. The engagement identified in the Fee Agreement to which the contingent fee applied clearly refers to the damages claim. Contrary to Giansante's and McGinley's interpretations, the Fee Agreement does not say that they are also entitled to their hourly fees in preparation for and resolution of the damages claim.

The Flints promptly signed the Fee Agreement for themselves and Polymeric on August 20, 1996. For reasons that need not detain us, suit was not instituted against the DeSanno defendants until March 2001.

Discussion:

"[T]he purpose of the Declaratory Judgments Act is to afford relief from uncertainty and insecurity with respect to legal rights, status and other relations." *Juban v. Schermer*, 751 A.2d 1190, 1193 (Pa.Super.2000). Under the Declaratory Judgments Act, the trial court is empowered to declare the rights and obligations of the parties, even if no

17

other relief is sought. Id. Ordinary summary judgment procedures are applicable to declaratory judgment actions. *Lititz Mutual. Insurance. Co. v. Steely*, 746 A.2d 607, 609 (Pa.Super.1999); *Keystone Aerial Surveys, Inc. v. Pennsylvania Property & Casualty Insurance Guaranty Association*, 777 A.2d 84,88 (Pa. Super. 2001).

In a declaratory judgment action, just as in civil actions generally, "[s]ummary judgment may be granted only in those cases in which the record clearly shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Harleysville Insurance Companies v. Aetna Casualty and Surety Insurance Company*, 795 A.2d 383, 385 (Pa. 2002) (citing *P.J.S. v. Pennsylvania State Ethics Commission*, 555 Pa. 149, 723 A.2d 174, 176 (1999); *Hydropress Environmental Services, Inc. v. Township of Upper Mount Bethel*, 836 A.2d 912, 918 (Pa. 2003).

Declaratory judgment relief may not be secured as a matter of right. Rather, its exercise is a matter of sound judicial discretion. There is no requirement that the court define the rights of the parties before conducting a trial, but such declaration is appropriate if it can be made on the facts educed before trial, and such declaration will be of material benefit in resolving the dispute. *Consolidated Coal Company et al v.*

18

*White et al*, 875 A.2d 318 (Pa. Super. 2005); *Osram Sylvania Products, Inc. v. Comsup Commodities, Inc.*, 845 A.2d 846 (Pa. Super. 2004); *William A. Warner, Jr. v. Continental/CNA Insurance Companies*, 688 A.2d 177 (Pa. Super. 1996). The declaration made by the trial court "may be either affirmative or negative in form and effect, and such declaration shall have the force and effect of a final judgment or decree". 42 Pa. C.S.A. §7532. Declaratory relief is "cumulative and additional, not in place of, other forms of relief. Therefore, it is clear that an action for declaratory judgment is designed to operate with, not instead of, any underlying dispute." *Bottomer v. Progressive Casualty Insurance Company*, 816 A.2d 1172, 1176 (Pa. Super. 2003).

The interpretation of a contract is a matter of law to be decided by the court. *Roman Mosaic and Tile Company v. Carney*, 729 A.2d 73, 77 (Pa. Super. 1999); *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999). When the contract is clear and unambiguous, the court examines the writing itself to give effect to the parties' understanding. *Creeks v. Creeks*, 619 A.2d 754, 756 (Pa.Super 1993); *Lange v. Meske*, 850 A.2d 737 (pa. Super. 2004). When construing agreements involving clear and unambiguous terms, the court need only examine the writing itself to give effect to the

19

parties' understanding as the contract is written. It may not modify the plain meaning of the words under the guise of interpretation, or stretch its meaning by attributing to it an unintended construction not supported by the contract language. *Vaccarello v. Vaccarello*, 757 A.2d 909 (Pa. 2000). Conversely, when the language is ambiguous and the intentions of the parties cannot be reasonably ascertained from the language of the writing alone, the parol evidence is admissible to resolve the ambiguity. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Walton v. Philadelphia National Bank*, 545 A.2d 1383, 1389 (Pa.Super.1988). The court must determine as a question of law whether the contract terms are clear or ambiguous. Id.

"Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Construction Company v. Harleysville Mutual Insurance Company,*

20

supra; *Wilcha v. Nationwide Mutual Insurance Company, 887 A.2d 1254 (Pa. 1999)*.

After reviewing literally hundreds of pages of materials submitted by the parties in support of their respective positions, including lengthy legal memorandums, the most striking aspect to me is the parties' concentration on their individual historical interpretations of the facts leading to this dispute, rather than a critical exegesis of the contract. One could argue that such diversity of opinion is, itself, support for a conclusion that the governing contract is ambiguous. However, I do not find that to be the case. Regardless of what the attorneys in this case would earnestly like the court to interpret the Fee Agreement to say or to mean, it is, in reality, a simple and straightforward document, perhaps too much so as attested by the litigation it has spawned. In any event, it is apparent from the already extensive record that there is nothing more the parties could produce by way of evidence at trial that would change my understanding of the contractual arrangement embodied in the Fee Agreement.

It anticipated the Lavin Firm's representation of the Flints in an action "arising out of damages sustained by the clients" in purchasing the Phoenixville Property on which were located buildings with "asbestos-

21

containing materials". Giansante and McGinley agreed to be bound by the terms of the Fee Agreement in their representation of the Flints. After the Fee Agreement was reached, in-ground contamination from another pollutant, lead, was found, and the focus of the litigation was expanded to include such contamination as an element of the damages sought. The complaint filed against the DeSanno defendants advanced various legal theories supporting recovery. However, the Fee Agreement was not revised to address any change in the terms and conditions of Giansante and McGinley's legal representation of the Flints arising after its execution, including discovery of additional contaminants. Rather, the Flints' liability remained to pay their attorneys one-third of the "net recovery" from the damages action. If no such recovery were obtained, the Flints would not owe their lawyers any attorneys' fees for their services rendered in attempting to recover damages associated with their Property's contamination and its remediation or for any other recovery sought in the damages action. The Flints agreed not to settle the damages case or any proceedings based thereon without their lawyers' consent, and, further, not to terminate their lawyers' employment "without consent of Attorneys and payment for services rendered". Obviously, this latter provision was intended to protect the

22

lawyers' fees by precluding their termination before they were paid for their legal work, as the quoted language is written in the conjunctive and not the disjunctive. Finally, the intent of the language of the Fee Agreement as it pertains to "non-monetary relief, such as indemnification" is clearly expressed, and is confirmed by the meetings and memorandums that preceded its execution, described above.

An examination of the legal nature of "indemnification" is also instructive in reaching my decision that the damages claim is not linked to the Agreement's provision governing non-monetary relief. Indemnification is defined as "[t]he action of compensating for loss or damage sustained." Black's Law Dictionary 772 (7th Ed.1999). The term "indemnity" is defined as: 1. A duty to make good any loss, damage, or liability incurred by another. 2. The right of an injured party to claim reimbursement for its loss, damage, or liability from a person who has such a duty. 3. Reimbursement or compensation for loss, damage, or liability in tort; [especially], the right of a party who is secondarily liable to recover from the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty. *Id*

23

Various examples can be cited, but two are pertinent here. "In the tort context, the right of indemnity rests upon a difference between the primary and the secondary liability of two persons, each of whom is made responsible by the law to an injured party. It is a right which inures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable." *Builders Supply Co. v. McCabe*, 77 A.2d 368 (Pa. 1951).

Indemnity is a common law equitable remedy that shifts the entire responsibility for damages from a party who, without fault, has been required to pay because of a legal relationship to the party at fault. In the context of tort indemnity, the liability of the indemnitor to the tort victim is primary and that of the indemnitee is secondary. *City of Wilkes-Barre v. Kaminski Brothers*, 804 A.2d 89 (Pa. Cmwlth. 2002). Before indemnification rights accrue, the party seeking indemnification must pay the claim or verdict damages before obtaining any rights to pursue indemnification. *Chester Carriers, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 767 A.2d 555, 563 (Pa.Super.2001). In the context of the Flint damages action, a settlement agreement could have been reached

24

in which the DeSanno defendants agreed to indemnify the Flints against statutory or common law liabilities they might incur in the future simply as owners of the Phoenixville Property, including required remediation, but that was not provided for in the DeSanno Settlement Agreement. Rather, the only unresolved monetary contributions arising under the Settlement Agreement were Textron's and Radiac's agreements to contribute two-thirds of "the costs to be incurred from this date forward for the completion of the environmental assessment of the subject property". (June 24, 2004 Court Order, para. 6).

Indemnification also typically arises in connection with an insured's claim under his insurance policy requiring his liability carrier to provide him with a defense and indemnify him against various types of loss. *401 Fourth Street, Inc. v. Investors Insurance Group*, 879 A.2d 166, 171 (Pa. 2005). That is obviously one of the circumstances contemplated by paragraph 6 in the Flints' Fee Agreement as described by Attorney Clinton in his August 1, 1996 letter to Theodore Flint.

The very nature of indemnification lends additional credence to the Flints' contention that the Fee Agreement was intended to draw a distinction between the direct claim for monetary damages brought by McGinley and Giansante on behalf of the Flints against the DeSanno

25

defendants, and claims seeking non-monetary relief, such as indemnification, in which the Flints could advance their right to seek liability protection from one or more of their insurance companies against third party claims asserted against them or, indemnification from prior owners of their Property. For the reasons discussed above, neither McGinley nor Giansante are entitled by the Fee Agreement to the additional hourly fees to which they claim entitlement attributable to their preparation of the damages claims asserted in the Flints' lawsuit against the DeSanno defendants and resolved by the DeSanno Settlement Agreement. Neither are they entitled to hourly fees under paragraph 6 of the Fee Agreement under the guise of preserving the Flints ability to secure the Ascribed Legal Benefits to the Flints. That paragraph clearly restricts hourly fees to time successfully spent securing non-monetary *relief*. On the record before me, the only such *relief* was Textron's and Radiac's limited contributions to the "costs" incurred going forward in completing the environmental assessment. Hourly legal fees attributable to other services provided by Giansante and McGinley are not compensable under paragraph 6 of the Fee Agreement.

The Supreme Court's decision in *Capek v. DeVito*, 767 A.2d 1047 (Pa. 2001), in conjunction with paragraph 2 of the Fee Agreement, adds

26

a legal wrinkle. In *Capek*, the question was whether, under the terms of a contingency fee agreement, an attorney discharged *before* resolution of a personal injury case retains a quantum meruit claim where the agreement so provided in the event of his termination by the client before the case was resolved. There, the discharged attorney had achieved a modest recovery before his termination that paled in contrast to the ultimate verdict. The court reversed summary judgment in the client's favor because disputed issues remained undecided relative to the quantum meruit claim. Instantly, however, the DeSanno defendants' litigation was settled while McGinley and Giansante remained the Flints' attorneys, the settlement was embodied in the terms of this court's June 24, 2004 Order, and the Flints paid their attorneys the required contingent fee based upon the settlement recovery of $40,800, all as mandated by the Fee Agreement. Once the Settlement Agreement was consummated by Court Order, their entitlement to legal fees was restricted by the recovery they actually achieved in that case, as provided for in paragraph 3 of Fee Agreement.

*Capek* does preserve McGinley's and Giansante's claim for payment of their legal fees arising from Textron's and Radiac's payments toward further environmental assessment of the Flint's Property,

27

described in paragraph 6 of the Court's June 24, 2004 Order approving the settlement Agreement. However, while those fee entitlements flow directly out of the settlement of the damages action, the liability of Textron and Radiac is stated in the Settlement Agreement in terms of "allocation" or the assignment of liability among the Flints and those defendants. Therefore, Giansante and McGinley are entitled to be paid for their legal services in securing those indemnity payments in accordance with paragraph 6 of the Fee Agreement.

The second aspect of McGinley's Motion, that is, requiring the Flints to provide Giansante with all investigative data arising from the on-going environmental assessment of their Property is resolved by my disposition of the first leg of McGinely's Motion. Neither of these Defendants has the right to oversight or direction of the Flints' affairs to protect fees to which it has been determined they are not entitled under the Fee Agreement. Defendants express the fear that the Flints will abbreviate completion of the environmental assessment. That concern is unavailing, however, since their fees under paragraph 6 of the Fee Agreement are already established by the time they spent in negotiating Textron's and Radiac's payments towards those costs. Even had my decision been otherwise, McGinley's brief cites no legal authority

28

supporting the relief sought in this respect, candidly admitting that the relief is sought to protect his and Giansante's fees. (McGinley's Brief, p. 14). In Pennsylvania, a client has the absolute right to choose his attorney, and I have no authority to force legal representation upon the Flints. *Hiscott and Robinson v. King*, 626 A.2d 1235 (Pa. Super. 1993).

As instructed by *Bottomer v. Progressive Casualty Insurance Company*, declaratory relief granted in this decision does not necessarily resolve the remaining, underlying dispute. Such is the case here. Resolution of the parties' remaining claims will be resolved at trial, unless settlement can be achieved with the court's assistance.

Accordingly, I enter the following:

29

## ORDER

AND NOW, August ___, 2006 McGinley's Motion For Declaratory Judgment is DENIED.

SENT

AUG 09 2006

Plaintiffs' Cross Motion For Declaratory Judgment is GRANTED to the following extent. Neither McGinley nor Giansante are entitled by the August 20, 1996 Fee Agreement to hourly fees to which they claim entitlement in connection with the DeSanno litigation, the same being wholly governed by paragraphs 1 through 3 of the Fee Agreement; nor are they entitled under that Fee Agreement to hourly fees attributable to their legal work in providing the Ascribed Legal Benefits described in the foregoing Opinion. Their entitlement to legal fees in negotiating indemnity payments by Textron and Radiac is governed by paragraph 6 of the Fee Agreement.

The remaining claims of the parties not resolved by this Opinion and Order shall be resolved at trial or by agreement of the parties, if any.

SO ORDERED.

BY THE COURT:

_____
Ronald C. Nagle          J.

30